**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In Re:

    **BOARD OF DIRECTORS OF**
    **TELECOM ARGENTINA S.A. AS**
    **FOREIGN REPRESENTATIVE OF**
    **TELECOM ARGENTINA S.A.,**

        Debtor in Foreign Proceeding.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In a Proceeding Under Section 304 of the Bankruptcy Code

Case: 05-17811 (BRL)

APPEARANCES:

DAVIS POLK & WARDWELL
Attorneys for Petitioner Telecom Argentina
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
By:    Karen E. Wagner
        Trisha Lawson
        Charles R. Nightingale
        Jordan Leigh Santeramo

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for Respondent The Argo Fund, Ltd.
1633 Broadway
New York, New York  10019
(212) 506-1700
By:    Michael M. Fay
        David S. Rosner
        Kim Conroy

DORSEY & WHITNEY LLP
Attorneys for US Bank National Association,
as Indentured Trustee
50 South 6th Street
Minneapolis, Minnesota  55402
(612) 752-7313
By:    Christopher T. Lenhart

Before:  Burton R. Lifland
United States Bankruptcy Judge

### FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING SECTION 304 PETITION AND ISSUING DECLARATORY RELIEF

Upon all the pleadings and submissions filed herein by petitioner, the Board of Directors of Telecom Argentina, S.A. (the "Board"), as foreign representative of Telecom Argentina, S.A. ("Telecom Argentina"), and by respondent, The Argo Fund Ltd. ("Argo"); and upon the record of and the evidence adduced at the trial held before this Court on December 12, 2005 (the "Hearing"), to consider the petition for an order under section 304 of title 11 of the United States Code (the "Bankruptcy Code"), granting recognition to a final order of a Court in Argentina approving the restructuring of Telecom Argentina under Argentine law pursuant to an *acuerdo preventivo extrajudicial* ("APE"), and Argo's objection to such request, and having received testimonial evidence submitted by petitioner's and respondent's witnesses, and having reviewed the evidence submitted; and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties,  see St. Clare's Hospital and Health Center v. Insurance Company of North America (In re St. Clare's Hospital and Health Center), 934 F.2d 15 (2d Cir. 1991) (citing United States v. El Paso Natural Gas Co., 376 U.S. 651, 656 (1964)), and having conducted an independent analysis of the law and the facts, this Court makes the following findings of fact and conclusions of law.

2

**FINDINGS OF FACT**

**The Parties**

1.      Telecom Argentina is a *sociedad anonima* organized under

Argentine law, with its principal place of business at Alicia Moreau de Justo 50,

Buenos Aires, Argentina.  Telecom Ex. 1 (Caride Trial Decl.) ¶ 2.[1]  Telecom

Argentina provides public telecommunications services in Argentina, in

particular, fixed-line local, national and international long distance services, data

transmission, and access to Internet service.  Id.  Through its subsidiaries, it also

provides mobile telecommunications services in Argentina and Paraguay.  Id.

2.      Argo, a Cayman Island-based entity, is an emerging markets fund

which, in its own name or through affiliates, beneficially owns over U.S. $35

million in notes (the "Notes") issued by Telecom.  [Argo  Ex. 3, ¶¶ 2-4

(Declaration of Andreas Rialas, sworn to on December 8, 2005); Docket No. 32;

Respondent The Argo Fund, Ltd's Answer, Defenses and Objections to the

Verified Petition of Telecom Argentina, S.A., dated October 11, 2005, Docket

No. 10].  The Notes were issued pursuant to the Trust Indenture Act of 1939

("TIA").  [Argo Ex. 3 at Ex. 2, p. i, §§ 4.07, 7.06; Telecom Ex. 1 at Ex. M]

---

[1] References to the trial transcript are indicated by "Tr. [Witness] ___." References to
trial exhibits are indicated by "Telecom Ex. __" or "Argo Ex. __."

3.      U.S. Bank, National Association ("US Bank"), is a national

banking association which serves as the Indenture Trustee for the Notes.

[Telecom Ex. 1, ¶ 4]

**Background**

4.      In late 2001, after almost four years of economic recession,

Argentina spiraled into a deep political, economic and social crisis. Telecom Ex. 1

(Caride Trial Decl.) ¶ 6.  The economic environment in Argentina deteriorated,

and in the first six months of 2002, the Argentine peso, which had been pegged to

the U.S. dollar at a fixed rate, was devalued and permitted to float freely.  Id.  In

addition, Argentina promulgated laws that converted the rates of services charged

to customers and due to Telecom Argentina into pesos.  Id.  Moreover, Argentina

also prohibited increases in public service rates or indexing of tariffs to foreign

currencies, and created uncertainties concerning Telecom Argentina's ability to

increase its rates.  Id.  Thus, Telecom Argentina was being paid in a rapidly

devaluing peso, was prevented from adjusting its rates, yet was required to pay its

foreign financial debt obligations in foreign currency.  The result was a severe

liquidity crisis.  Id.

5.      As of December 31, 2001, Telecom Argentina was the obligor on

approximately US$3.3 billion of debt (the "Old Debt") on a consolidated basis,

including both notes issued in Europe and the United States (the "Old Notes"),

and debt issued under various credit agreements in the United States and

4

elsewhere which, together with the notes, constituted the Old Debt.  Id. at ¶ 7.  As of December 31, 2001, the Old Debt included:

- The equivalent of approximately US$1,572 million aggregate principal face amount of outstanding Old Notes issued under medium term note programs;

- The equivalent of approximately US$1,626 million aggregate principal face amount of outstanding loans owed to financial institutions relating to working capital loans, debt issuances and trade financings; and

- The equivalent of approximately US$52 million in accrued but unpaid interest (including penalties and post-default interest rate increases) on outstanding notes and outstanding loans, calculated, in each case, at the rate specified in these notes and loans.

Id.

6.    On February 27, 2002, Telecom Argentina hired Morgan Stanley & Co. Inc. and MBA Banco de Inversiones S.A. as its financial advisors to develop a comprehensive plan to restructure the Old Debt.  Id. at ¶ 8.

7.    On April 2, 2002, Telecom Argentina publicly informed investors of the need to suspend principal payments on all of its Old Debt, and, on June 24, 2002, announced the suspension of interest payments.  Telecom Ex. 1, Tabs A (Press Release, dated 4/2/02) and B (Press Release, dated 6/24/02).

8.    Throughout the restructuring process, Telecom Argentina communicated both formally and informally with its creditors.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 10.  Telecom Argentina posted, in Spanish, English and

5

Italian, press releases concerning its debt restructuring efforts on its public

website.  Id.; see *http://www.telecom.com.ar/index-flash.html.*

9.      Telecom Argentina also worked with a group of creditors acting as

an *ad hoc* creditors' committee (the "Committee").  Id. at ¶ 11.  On June 4, 2002,

Telecom Argentina received a letter from the Committee requesting negotiations

regarding the restructuring.  Id.  Telecom Argentina indicated its willingness to

work with the Committee, and agreed to pay for the Committee's U.S. counsel,

Cleary Gottlieb Steen & Hamilton LLP, and Argentine counsel, Errecondo,

Salaverri, Dellatore, Gonzalez & Burgio Abogados.  Id.

10.     Telecom Argentina held an initial meeting with the Committee in

Buenos Aires in mid-2002.  Id. at ¶ 12.

11.     On September 17, 2002, Telecom Argentina held a meeting with

members of the Committee where the June 30, 2002 earnings results were

reviewed, together with Telecom Argentina's business plan.  Id. at ¶ 13.

12.     On October 3, 2002, Telecom Argentina met again with the

Committee in Buenos Aires to provide additional information on its financial

condition and business plan, and to present its initial proposal for restructuring the

Old Debt on a consensual basis.  Id. at ¶ 14.  The participants discussed the

amount of debt to be issued to the holders of Old Debt and rates of interest

thereon, whether any equity or equity-linked instrument would be issued to

creditors, the amount and terms of any equity capital that creditors would receive,

the extent, if any, to which a part of the new debt obligations would be collateralized, and the terms of specific covenants. Id.

13.    The Committee first presented formal comments on Telecom Argentina's proposal in a letter dated October 24, 2002, to which Telecom Argentina responded by letter and at a meeting held with the Committee on November 18, 2002. Id. at ¶ 15.

14.    During the week of December 16, 2002, Telecom Argentina held a series of meetings with members of the Committee to revise the assumptions and general guidelines used for the business plans. Id. at ¶ 16.

15.    On February 5, 2003, Telecom Argentina presented a revised restructuring proposal to the Committee which included an equity participation and, as an initial step in the restructuring, a proposal to conduct a cash tender offer for a portion of its financial debt obligations and to make partial interest payments on the financial debt obligations. Id. at ¶ 17.  While the Committee did not endorse either, it indicated that it would not block the tender offer. Id.

16.    Telecom Argentina publicly announced its intention to launch the tender offer on February 12, 2003. Id. at ¶ 18.  Press releases and other information regarding the transaction were posted on Telecom Argentina's public website. Id.

17.    The tender offer commenced on April 16, 2003 and expired on June 2, 2003. Id. at ¶ 19.  The offering document for the cash tender offer also described the restructuring proposal. Id.  Cash consideration for the tender offer

7

and partial interest payments were paid on June 9, 2003.  Id.  Telecom Argentina

was able to purchase and retire the equivalent of approximately US$208 million

of its outstanding financial indebtedness for the equivalent of approximately

US$115 million (representing a 45% discount), and repaid a portion of the

accrued interest on all of its financial indebtedness for an equivalent of US$98

million.  Id.

18.     After the expiration of the tender offer, Telecom Argentina and the

Committee continued to negotiate.  Id. at ¶ 20.  No mutually acceptable proposal

emerged.  Id.

19.     Between October 29, 2003 and January 8, 2004, Argo purchased

560,000 Euro of Old Notes.  Argo Ex. 3 (Rialas Decl.), Tab A.

20.     On January 9, 2004, Telecom Argentina announced its own

restructuring proposal pursuant to an *Acuerdo Preventivo Extrajudicial* ("APE"),

an out-of-court restructuring agreement governed by Argentine law.  Telecom Ex.

1, Tab C (Press Release, dated 1/9/04).

21.     On January 9, 2004, Argo purchased an additional 5,000,000 Euro

of Old Notes.  Argo Ex. 3 (Rialas Decl.), Tab A.

22.     On January 23, 2004, Telecom Argentina was informed that the

Committee believed its proposal was not acceptable.  Telecom Ex. 1 (Caride Trial

Decl.) ¶ 20.

23.     The Board determined to go forward with the APE process, finding it to be the appropriate method by which to effect the restructuring proposal.  Id. at ¶ 21.

24.     Since Telecom Argentina's debt was held in several countries, Telecom Argentina determined that it would conduct its solicitation of consents to the APE proposal pursuant to the applicable public offering regulations in Argentina, the United States and Italy.  Id. at ¶ 22.  Therefore, Telecom Argentina filed a registration statement (the "Registration Statement") describing the APE proposal with the U.S. Securities and Exchange Commission (the "SEC").  Id.  Subsequent press releases and modifications were also filed with the SEC, and were reviewable on the SEC's EDGAR website.  Id.  A similar solicitation statement was filed with the Argentine and Italian securities regulators.  Id.

25.     The initial APE proposal offered the holders of Telecom Argentina's Old Debt three different consideration options, including a mix of fixed rate, floating rate and pay-in-kind debt securities (the "New Notes"), and a cash alternative.  Id. at ¶ 23.  Telecom Argentina also proposed to make a partial cash interest payment to each holder for the period from January 1, 2004 through the issuance date of the New Notes.  Id.

26.     On April 7, 2004, the Committee submitted a preliminary response to Telecom Argentina's proposal.  Id. at ¶ 24.  Thereafter, Telecom Argentina made modifications based on the concerns and comments of the creditors.  Id.

27.     During the week of April 12, 2004, Telecom Argentina held meetings in New York City at which representatives of Telecom Argentina, its financial advisors and counsel, and representatives of the Committee and its counsel were present, in order to negotiate an amended proposal.  Id. at ¶ 25.

28.     On May 10, 2004, Telecom Argentina announced the timeline for the commencement of the solicitation process and the terms of a modified proposal which represented the core details of the final proposal and reflected the concerns expressed by the Committee.  Id. at ¶ 26.  Among other things, in accordance with the Committee's feedback, the amended proposal simplified the terms of the consideration offered to the creditors and provided for higher interest rates for the New Notes.  Id.  The modified proposal also included modifications to the terms of the covenants, made at the insistence of the Committee, to provide further protections and benefits for creditors.  Id.  The full details of the proposal were set forth in Amendment No. 1 to the Registration Statement, which was filed with the SEC and other agencies on May 11, 2004.  Id.

29.     The Committee and its counsel, as well as a representative of Italian noteholders, and other creditors, worked with Telecom Argentina to finalize the proposed form of the APE, the form of indenture for the New Notes to be issued under the APE, and other relevant documentation.  Id. at ¶ 27.

30.     On June 22, 2004, Telecom Argentina filed Amendment No. 2 to the Registration Statement.  Id. at ¶ 28.  The Committee supported the proposal.  Id.  On July 9, 2004, the solicitation statement was again amended to reflect

modifications to the proposal reflecting negotiations with creditors of a significant

subsidiary.  Telecom Ex. 1, Tab D (Final Solicitation Statement).  The statement

was also filed with Argentine and Italian securities regulators.  Telecom Ex. 1

(Caride Trial Decl.), ¶ 28.

31.     Telecom Argentina publicized the final solicitation by issuing

press releases and distributing the solicitation statement to its creditors through

the holders of record and/or the clearing systems[2] that held the Old Debt.  Id. at

¶ 29.  Telecom Argentina also hired a proxy service, GSC Proxitalia, to assist

with the dissemination of the solicitation statement and investor inquiries in the

United States, Italy and Argentina.  Id.

32.     In the weeks of June 28, 2004 and July 5, 2004, Telecom

Argentina marketed the final restructuring proposal by means of a roadshow in

Miami, New York, London, Milan and Geneva.  Id. at ¶ 30.  During the

roadshow, Telecom Argentina met with several institutional investors and

described the final proposal.  Id.  During the week of July 12, 2004, Telecom

Argentina held meetings in Buenos Aires with participant banks and investors to

describe the final debt restructuring proposal.  Id.

33.     The APE solicitation period expired on August 6, 2004 (in Italy,

on July 30, 2004).  Id. at ¶ 31.

---

[2] The clearing systems are systems for transferring bonds and cash between buyers and
sellers. Transfers of bonds are usually made by book entry transfer.  The systems used for these
securities are Depository Trust Company, Euroclear Bank S.A./N.V. and Clearstream Banking
S.A (Luxembourg).

34.    Telecom Argentina took the position that all consenting creditors affected by the APE must be treated equally.  Its proposals provided that all holders of Old Debt be given three consideration options, which were, generally:

- Option A: New Notes due 2014 (the "Series A notes") to be issued in an amount equal to the principal face amount of the outstanding notes, plus an adjustment for a portion of the unpaid interest; or

- Option B: New Notes due 2011 (the "Series B notes") (constituting, together with the Series A notes, the New Notes) which were to have a shorter maturity and higher interest rate, but which were to be issued at a discount of approximately 5.5% to the principal face amount and adjustment for a portion of the unpaid interest (creditors selecting Option B agreed to have up to 37.5% of their debt allocated into the cash option described below); or

- Option C: A cash payment in equivalent U.S. dollars at a price not greater than 850 nor less than 740, to be determined pursuant to a "Modified Dutch Auction."

Id. at ¶ 32.

35.    Depending on their elections, creditors would be paid amounts ranging from 80.3% (for creditors electing the cash option) to 100% (for creditors electing to receive Series A notes) of the outstanding principal face amount of their claims plus an adjustment factor that represented a portion of unpaid interest. Id. at ¶ 33.  According to Telecom Argentina's Argentina law expert, Dr. Lorente, the consideration options offered to creditors amounted to "the best consideration" he has ever seen in an APE.  Tr. Lorente 31:18-31:20.

12

36.    On August 23, 2004, Telecom Argentina announced that approximately <u>94.4%</u> in principal face amount, or approximately <u>82.4%</u> in number, of the holders of Old Debt had consented to the APE proposal.  Telecom Ex. 1, Tab E (Press Release, dated 8/23/04) (emphasis supplied).

37.    Between January 9, 2004 and August 26, 2004, Argo had purchased 14,010,000 Euro, 13,535,000,000 ITL and US$1,000,000 of Old Notes.  Argo Ex. 3 (Rialas Decl.), Tab A.

38.    The APE was executed on August 26, 2004.  Telecom Ex. 1, Tab F (APE Agreement).

39.    The next day, Argo purchased 2,755,000,000 ITL and 615,000 Euro of Old Notes.  Argo Ex. 3 (Rialas Decl.), Tab A.  On or about September 13, 2004, long after the commencement of the APE process, Argo wrote to First Trust of New York, N.A., the predecessor to U.S. Bank National Association ("U.S. Bank" or "Indenture Trustee") as Indenture Trustee for the Old Notes.  Telecom Ex. 1, Tab M (Letter, dated 9/13/04).  The letter stated that Argo held over US$20 million principal amount of Old Notes, and requested that the Indenture Trustee not exchange Argo's Old Notes, stating that Argo would take all actions necessary to enforce its rights under the Old Notes in the United States.  <u>Id.</u>

> Argo has been informed that in issuing the APE Notes, Telecom Argentina is purportedly availing itself of foreign insolvency proceedings.  This contention cannot justify the forced exchange of the Notes for APE Notes.  First, any such insolvency laws cannot supersede the mandates of the TIA.  Second, Telecom Argentina is clearly not insolvent.

13

Id.

40.    On October 21, 2004, Telecom Argentina submitted its APE to the

*Juzgado Comercial No. 19, Secretaria No. 38* (the National Commercial Court

No. 19) in Buenos Aires, Argentina (the "Argentine Court"), commencing a

proceeding under Chapter VII, Title II of Law No. 24,522, as amended (the

"Argentine Insolvency Law").  Telecom Ex. 1 (Caride Trial Decl.), ¶ 35.

41.    Argo had purchased an additional 2,296,000 Euro, 2,755,000,000

ITL and US$120,000 of Old Notes between August 27, 2004 and October 21,

2004.  Argo Ex. 3 (Rialas Decl.), Tab A.  On November 10, 2004, Argo

purchased another 66,000 Euro of Old Notes.  Id.

42.    On December 6, 2004, the Argentine Court ordered Telecom

Argentina to convene a meeting of noteholders at which they would vote on the

APE and select a consideration option.  Telecom Ex. 3, Tab F (Argentine Court

Order, dated 12/6/04).  The Argentine Court ordered Telecom Argentina to

publish notices of the meeting for five business days in specified newspapers in

Argentina as well as in other markets where the Old Notes were issued.  Id.  In

addition, the Court designated examiners to verify the submission of consents to

the APE pursuant to the solicitation and oversee the outcome of the noteholders

meeting.  Id.

43.    From January 3, 2005 through January 7, 2005, Telecom Argentina

published notices that the noteholders meeting would be held on February 4,

2005, in compliance with the Argentine Court's order.  Telecom Ex. 1 (Caride

14

Trial Decl.), ¶ 37.  Notice was published in the United States in the Wall Street
Journal.  Telecom Ex. 1, Tab G (Wall Street Journal Notice).  Notice was also
published in the London Financial Times, the Luxemburg Wort, Il Sole 24 Ore of
Italy, the Buenos Aires Stock Exchange Bulletin, and six widely distributed
Argentine newspapers (collectively, the "Journals").  Telecom Ex. 1 (Caride Trial
Decl.), ¶ 37.

44.    On January 7, 2005, counsel for Argo sent another letter to the
attorneys for U.S. Bank, the Indenture Trustee, claiming to be "a holder of over
USD $30 million in principal amount of notes" under the March 2000 Indenture,
informing U.S. Bank of Telecom Argentina's February 4, 2005 bondholder
meeting and indicating its refusal to "[support] the Agreement or [elect] any of
the options under that Agreement on February 4."  Telecom Ex. 1, Tab N (Letter,
dated 1/7/05).

45.    Argo warned the Indenture Trustee that if it "(a) takes any action
as a result of the Agreement that results in the release, cancellation, transfer or
exchange of the Notes in which Argo holds a beneficial interest; or (b) acts in any
way to facilitate the terms of the Agreement and deprive Argo of its rights under
these Notes" without Argo's written consent, Argo would "use all available
means to enforce its rights."  Id.

> As we have previously discussed, Telecom
> Argentina has publicly announced that it intends to
> hold a bondholder meeting in Buenos Aires,
> Argentina, on February 4, 2005, for the purpose of
> seeking approval for a purported Out-of-Court
> Reorganization Agreement ("Agreement").  (A

15

copy of a notice that appeared in the January 3, 2005 edition of the *Wall Street Journal* is attached.) Through this Agreement, Telecom Argentina seeks to compel Note holders to accept new notes (the "APE Notes") which bear a lower interest payment obligation and have a longer period of maturity than the Notes. Such efforts clearly violate the provisions of the Trust Indenture Act of 1939, which are expressly incorporated in the Notes.

Although Telecom Argentina contends that the Agreement is part of a U.S.-like bankruptcy plan of reorganization, it is not, and the Agreement violates one of the most fundamental protections provided creditors under U.S. law: the best interests test. Telecom Argentina, with over $2 billion in market capitalization, is solvent. Accordingly, the Note holders that U.S. Bank represents are entitled to payment in full with interest to the date of payment. The Agreement provides far less.

Further, the Agreement violates a second fundamental creditor right: absolute priority. Here, the shareholders of Telecom Argentina will, under the terms of the Agreement, retain 100 percent of their investment in Telecom, which creditors will be compelled to accept less than 100 percent of the amounts they are owed. Indeed, since Telecom Argentina announced its plan to exchange the Notes for APE Notes, Telecom shares have risen significantly; clearly, bondholder value is being stripped and redistributed to shareholders.

Id.

46.    Counsel for U.S. Bank responded on January 14, 2005, agreeing

not to cancel or transfer Argo's Old Notes, but stating that the "confirmation is

subject to actions that [the Indenture Trustee] may be legally required to take

pursuant to or under force of law, including without limitation, court orders and

16

governing documents, such as the Indenture." Telecom Ex. 1, Tab O (Letter, dated 1/14/05).

47.     The noteholders meeting was held in Buenos Aires on February 4, 2005.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 38.  Participants included one consenting creditor appearing in person; a representative of non-Italian noteholders appearing via powers of attorney; a representative of Italian noteholders acting via powers of attorney; and the Indenture Trustee for the Old Notes.  Id.  All noteholders participating in person or voting by proxy cast ballots in favor of the APE.  Id.

48.     The Argentine Court examiners reviewed the solicitation materials and each letter of transmittal submitted by the holders of the debt instruments together with certificates issued by the clearing systems to verify the completeness of the documentation and the accuracy of the calculations of the majorities achieved in the solicitation.  Id. at ¶ 39.

49.     On February 25, 2005, after conducting an examination of the procedural fairness of the APE solicitation process and verifying the completeness of the documentation and the accuracy of the calculations of the majorities achieved during that process, the Argentine Court accepted the APE as having been duly and validly approved by the requisite majorities under the Argentine law.  Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05).

50.     The Court ordered Telecom Argentina to publish notices of the approval of the APE in specified newspapers in Argentina, as well as in other

markets where the Old Notes were issued, and granted creditors the right to assert

any objections regarding the APE before April 7, 2005.  Id.  The Court also

imposed a "general restraint on the disposition of the debtor's property."  Id.

     51.    From March 4, 2005 to March 22, 2005, Telecom Argentina

published notices of the approval of the APE in the Journals.  Telecom Ex. 1

(Caride Trial Decl.), ¶ 41.

     52.    Subsequently, creditors raised four objections with the Argentine

Court.

        a)  Two tax authorities objected on the grounds that the amounts owed to them were greater than the ones reported by Telecom Argentina in the statement of assets and liabilities filed with the Argentine Court in connection with the APE.

        b)  One creditor objected to the form of consideration to be provided to non-consenting and absent creditors and requested that non-consenting and absent creditors be permitted to elect the form of consideration to be paid to them.

        c)  One creditor objected on the grounds that (i) the consideration to be paid to the creditors under the APE was less than Telecom Argentina's liquidation value and (ii) Telecom Argentina failed to include a bankruptcy petition in the list of judicial proceedings required to be filed with the Argentine court together with the APE.

Telecom Ex. 1 (Caride Trial Decl.), ¶ 42; Telecom Ex. 1, Tab I (Argentine Court

Order, dated 5/26/05).

18

53.     It is not disputed that neither Argo nor U.S. Bank raised any objections with the Argentine Court.

54.     Argo's letters to the Indenture Trustee demonstrate that Argo had notice of Telecom Argentina's APE proceedings, and had articulated its objections to the Indenture Trustee.  Nevertheless, Argo failed to bring these objections to the attention of the Argentine Court.

55.     Telecom Argentina responded to the four objections raised by creditors.  Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

56.     On May 26, 2005, the Argentine Court overruled the objections and issued the Approval Order, approving the APE.  Id.

57.     Noting Telecom Argentina's business crisis, the Court overruled all objections and held that the APE was not abusive, fraudulent or discriminatory.

> In respect of the proposal made, taking into
> consideration the restructuring sought as a means of
> turning around the business crisis, the elements
> provided to the case by the debtor and those
> required by the Court, such proposal does not
> appear to be abusive, fraudulent or discriminatory in
> accordance with the applicable legal regulations.

Id.

58.     The Court also ordered that Telecom Argentina grant those holders of Old Debt that had not selected a payment option under the APE the right to select one of the three consideration options available to consenting creditors.  Id. To alert non-consenting and absent creditors of this right, the Court ordered Telecom Argentina to publish notice of the Approval Order stating that holders of

19

Old Debt that had not selected a payment option under the APE had an additional

ten court days following the last publication of the notices in which to do so.  Id.

59.     On June 16, 17 and 20, 2005, Telecom Argentina published notices

in the Journals.  Telecom Ex. 1 (Caride Trial Decl.) ¶ 43.  Some creditors did

avail themselves of the opportunity to elect payment.  Id.

60.     Telecom Argentina also advised the Court that it would establish a

trust into which it would deposit the consideration for payment to any remaining

non-consenting creditor.  Id. at ¶ 44.

61.     Meanwhile, during April and May 2005, Telecom Argentina held

discussions regarding the procedures for completing the APE (the "Closing") with

The Bank of New York,[3] the clearing systems and the Indenture Trustee.

Telecom Ex. 1 (Caride Trial Decl.), ¶ 52.  Because the APE provided that all of

the Old Debt was to be cancelled upon receipt of the requisite consideration by

the creditors, the discussions addressed the mechanics for cancellation.  Id.

62.     In the course of these discussions, U.S. Bank agreed that it would

order the cancellation of the outstanding notes held by the consenting creditors at

the Closing.  Id. at ¶ 53.  However, U.S. Bank indicated that, in the absence of an

order from a U.S. court directing it to do so, it would not take any action to cancel

the Old Notes held by creditors who had not affirmatively consented to the APE

or to cancellation.  Id.

---

[3] The Bank of New York was the "settlement agent" under the terms of the APE, acting
as attorney in fact for holders of outstanding notes.  Telecom Ex. 1, Tab F (APE Agreement), at 1.

63.    On May 30, 2005 Telecom Argentina wrote to U.S. Bank to request that it complete the APE and cancel the outstanding Old Notes at the Closing in accordance with the Argentine Court's Approval Order.  Telecom Ex. 1, Tab P (Letter, dated 5/30/05).

64.    U.S. Bank responded on June 3, 2005, stating that it would only agree to cancel the Old Notes held by consenting creditors and would not cancel Old Notes of nonconsenting creditors absent a U.S. court order that "governs the Indenture and the rights of noteholders."  Telecom Ex. 1, Tab Q (Letter, dated 6/3/05).

65.    On July 6, 2005, Argo purchased 400,000,000 ITL of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

66.    On August 11, 2005, Telecom Argentina's Board of Directors passed a resolution (the "Resolution") authorizing the filing of the Section 304 Petition should U.S. Bank continue to refuse to cancel the Old Notes.  Telecom Ex. 1, Tab T (Telecom Argentina Board Minutes).

67.    On August 24, 2005, Telecom Argentina announced its intent to complete the Closing on August 31, 2005.  Telecom Ex. 1, Tab J (Press Release, dated 8/24/05).

68.    On August 31, 2005, the Closing occurred.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 46; Telecom Ex. 1, Tab K (Press Release, dated 8/31/05).  Telecom Argentina paid, or made available to, creditors the consideration owing pursuant

to the APE, and the Old Debt was extinguished as a matter of Argentine law.

Telecom Ex. 1 (Caride Trial Decl.), ¶ 46.

69.     In connection with the Closing, the Old Notes held by creditors

that had consented to the APE were cancelled.  Id.  Approximately US$80 million

of Old Notes, held by creditors who had not consented to the APE, were not

cancelled.  Id.

70.     The consideration owing to non-consenting holders was paid into a

trust.  Id.  That consideration has been made available for distribution to creditors

that have acknowledged the extinguishment of their claims and have agreed to

cancellation of the Old Notes.  Id.

71.     On the date of the Closing, Argo purchased 319,000 Euro of Old

Notes.  Argo Ex. 3 (Rialas Decl.), Tab A.

72.     On September 6, 2005, Telecom Argentina again requested that

U.S. Bank cancel the remaining Old Notes.  Telecom Ex. 1, Tab R (Letter, dated

9/6/05).  U.S. Bank again refused to do so.  Telecom Ex. 1, Tab S (Letter, dated

9/12/05).

73.     Between the August 31, 2005 Closing date and December 5, 2005,

additional non-consenting creditors agreed to the terms of the APE and collected

payments totaling approximately US$34,230,000.  Telecom Ex. 1, Tab L (Chart

of Positions of Non-Participating Creditors).

74.     On September 9, 2005, Argo purchased US$1,640,625 of the New

Notes issued under the APE.  Argo Ex. 3 (Rialas Decl.), Tab A.

75.    The Indenture Trustee's refusal to cancel the Old Notes held by the non-consenting creditors, notwithstanding the occurrence of the Closing, deprives Telecom Argentina, and those creditors who have consented to the APE, of the full benefit of the APE.

76.    A failure by Telecom Argentina to adhere to the equality of treatment that was the basis for the APE and was mandated by the Approval Order would constitute a breach of the APE, and would violate Argentine law, see, infra.  The evidence shows that a breach of the APE could also have a detrimental effect on Telecom Argentina's relationships with its current and future creditors and a negative impact on Telecom Argentina's ability to secure financing in the future.

**Section 304 Proceedings and Trial**

77.    On September 13, 2005, the Board filed a verified Section 304 petition commencing, on behalf of Telecom Argentina, a case ancillary to a foreign proceeding pursuant to Section 304 of the Bankruptcy Code. (Verified Petition For Relief Under 11 U.S.C. § 304 (Docket No. 1)).

78.    The petition sought judgment declaring that the Approval Order and the APE should be given full force and effect in the United States, to the same degree as they are given effect in Argentina; that the Approval Order and the APE are binding on all creditors and their agents, as well as on any trustee or agent or other intermediary for the Old Notes, as they are in Argentina; and that, since the

Closing had occurred, all of the Old Notes had been extinguished and must be cancelled.  Id.

79.    On September 21, 2005, U.S. Bank sent a notice to holders of the Old Notes informing them of the filing of the 304 Petition and of the objection deadline.  (U.S. Bank's Limited Objection to Relief Requested Under 28 U.S.C. § 2201 Pursuant to Section 304 Petition (Docket No. 9), at 3-4).

80.    Thereafter, on October 11, 2005, U.S. Bank filed a limited objection to the Section 304 Petition, requesting the inclusion of certain language protective of the Indenture Trustee in any order granting the requested relief. (U.S. Bank's Limited Objection to Relief Requested Under 28 U.S.C. § 2201 Pursuant to Section 304 Petition (Docket No. 9)).

81.    On October 11, 2005, Argo filed a purported answer ("Answer") to the Section 304 Petition.  (The Argo Fund, Ltd.'s Answer, Defenses and Objections to the Verified Petition of Telecom Argentina, S.A. (Docket no. 10)). Argo also filed a motion to withdraw the reference of the Section 304 Petition in the United States District Court for the Southern District of New York ("District Court") on the grounds that consideration of Telecom Argentina's petition would require substantial and material consideration of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, et seq. ("Trust Indenture Act").  (Argo's Mem. of Law in Support of its Mot. to Withdraw the Ref. From the Bankr. Ct. Pursuant to 28 U.S.C. § 157(d) (Docket no. 12)).

82.     Telecom Argentina filed a response, contending that withdrawal was unwarranted.  (Pet.'s Mem. Of Law in Opposition to Mot. to Withdraw the Ref. (District Court Docket no. 6)).

83.     On November 18, 2005, the District Court denied Argo's motion to withdraw the reference, finding that if the Trust Indenture Act was relevant at all, its application would be a routine matter, and that the critical question was whether the requirements of Section 304 were met, a matter squarely within the expertise of this Court.  In re Bd. of Dirs. of Telecom Argentina, No. 05 Civ. 8803 (SAS), 2005 U.S. Dist. LEXIS 28640, *11 (S.D.N.Y. Nov. 18, 2005).

84.     Meanwhile, Argo had attempted to purchase approximately US$386,657.01 of the Old Notes but was prevented from doing so by the terms of Telecom Argentina's APE, which blocked the purchase of Old Notes after the Closing had occurred and the Old Notes had been extinguished.  Argo Ex. 3 (Rialas Decl.), Tab A.

85.     On November 11, 2005, Telecom Argentina moved in limine to prevent introduction of evidence addressing Telecom Argentina's financial eligibility to file an APE on the grounds, inter alia, that no collateral attack of the Argentine Court's Approval Order would be permissible.  (Pet.'s Mot. in Limine to Exclude the Testimony of Prof. Israel Shaked [proffered expert] and Evidence of Telecom Argentina's Financial Status (Docket no. 19)).

86.     On November 22, 2005, this Court granted Telecom Argentina's motion in limine to prevent the introduction of evidence regarding Telecom

Argentina's financial eligibility to file an APE. (Order Granting Mot. *in Limine* (Docket no. 27)).

87.     On December 12, 2005, a trial was held before this Court.

88.     At the trial, Telecom Argentina introduced the testimony of Mr. Pablo Caride, Finance Director of Telecom Argentina, who testified to the background facts that were the cause of Telecom Argentina's financial difficulties, and to the APE process, including both the negotiating phase and the court-supervised stage. Telecom Ex. 1 (Caride Decl.). Mr. Caride also introduced copies of, *inter alia*, the APE, the Argentine Court orders, the various documents filed with regulatory authorities, and the letters sent by Argo to the Indenture Trustee. Telecom Ex. 1, Tab D (Final Solicitation Statement), Tab F (APE Agreement), Tab H (Argentine Court Order, dated 2/25/05), Tab I (Argentine Court Order, dated 5/26/05), Tab M (Letter, dated 9/13/04) and Tab N (Letter, dated 1/7/05). All of Mr. Caride's evidence was introduced into evidence without objection. Tr. 4:17-5:3.

89.     In addition, Telecom Argentina introduced the testimony of Dr. Javier Lorente, an expert in Argentine insolvency law. Dr. Lorente's testimony was introduced in written form as well as pursuant to live testimony. Telecom Ex. 2 (Lorente Decl.); Telecom Ex. 3 (Lorente Supp. Decl.); Tr. 22-56, 86-91. Dr. Lorente's credentials as an expert were not challenged.

90.     U.S. Bank introduced no evidence.

26

91.     Argo introduced the testimony of Mr. Andreas Rialas, the Chief

Executive of Argo Capital Management Ltd., the investment advisory company

for Argo.  Argo Ex. 3 (Rialas Decl.), ¶ 1.  Mr. Rialas testified to Argo's beneficial

interest in Telecom Argentina's Old Notes.  Id. at ¶¶ 2-4 and Tab A.  Mr. Rialas's

testimony was introduced in written submission only.  Argo Ex. 3 (Rialas Decl.);

Tr. 85:10-85:15.

92.     Argo also introduced the testimony of Dr. Julio César Rivera, its

Argentine insolvency law expert.  Dr. Rivera's testimony was introduced in both

written form and pursuant to live testimony.  Argo Ex. 1 (Rivera Trial Decl.);

Argo Ex. 2 (Rivera Supp. Decl.); Tr. Rivera 57-85.

93.     Post-trial submissions were required to be submitted by January

31, 2006.  (Minute Order (Docket no. 35)).

**Argentine Insolvency Law**

94.     The testimony of the Argentine experts demonstrates that the

Argentine Insolvency Law, and Telecom Argentina's APE, meet the requirements

of Section 304 of the Bankruptcy Code.

A.      An APE is Governed by Argentine Insolvency Law

95.      The Argentine Insolvency Law provides for three types of insolvency-related proceedings, two of which are consensual and one of which is a liquidation.  Tr. Lorente 23:8-23:16, 53:4-53:8, 53:15-53:16.  The two proceedings intended to effect a consensual arrangement between the debtor and its creditors are the *concurso preventivo* proceeding and the *acuerdo preventivo extrajudicial,* or "APE."  Tr. Lorente 23:8-23:16.  An APE proceeding is thus an insolvency proceeding.  Tr. Rivera 67:16-67:23.

96.      The APE law employed by Telecom Argentina had been amended in May 2002 (the "May 2002 Amendment") to recognize that a privately negotiated debt restructuring plan, supported by a qualified majority of a debtor's unsecured creditors prior to its filing, if confirmed by a court of competent jurisdiction, would become binding upon non-consenting holders of affected debt.  Tr. Lorente 23:18-23:24.  The May 2002 Amendment thus permitted a process which is analogous to a United States pre-packaged plan process.

97.      The May 2002 Amendment was issued in the midst of a severe economic and financial crisis affecting the Argentine economy, which produced an extended inability of the private sector to honor its debts in accordance with their original terms.  The devaluation of the peso, the restrictions on the banking system, the "pesification" and freezing of the public service tariffs and the default of the Argentine sovereign debt deeply affected the performance of the Argentine economy, resulting in a substantial decrease of the gross domestic product in year

28

2002 and a substantial increase in inflation.  In re Bd. of Dirs. of Multicanal, S.A., 314 B.R. 486, 493 (Bankr. S.D.N.Y. 2004).

98.     The May 2002 Amendment rendered the APE Proceeding an effective means of solving conflicts between debtors and creditors by making a judicially confirmed APE binding on all creditors affected by such APE, while avoiding the expense of the more cumbersome and time-consuming *concurso preventivo* proceeding.  Telecom Ex. 2 (Lorente Decl.), ¶ 7.  Argo's expert, Dr. Rivera, noted that this amendment gave the APE law a "true usefulness" that had previously been absent.  Telecom Ex. 3, Tab E (Article by Dr. Rivera entitled, *"Instituciones de Derecho Concursal"*), at 544.

99.     While Dr. Rivera initially contended that the APE process is not an insolvency proceeding, he acknowledged that his position has been rejected by Argentine courts.  Tr. Rivera 67:6-67:25.  Indeed, at least ten lower Argentine courts and three appellate-level courts have explicitly held that an APE proceeding constitutes an insolvency proceeding under Argentine Insolvency Law.  Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 9.

**B.     Commencing the APE Process**

100.     In order to invoke the APE law, the debtor must be either insolvent or in "general financial or economic difficulties."  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 69.  Thus, a debtor is not required to be insolvent.  Telecom Ex. 2 (Lorente Decl.), ¶ 31; Argo Ex. 1 (Rivera Trial Decl.), ¶ 14.

29

101.    In similar fashion to a U.S. Bankruptcy Code pre-packaged plan, to commence the APE process, the debtor must first formulate a financial restructuring proposal with its affected creditors.  Eventually, the debtor will execute an APE agreement with those creditors.  Telecom Ex. 2 (Lorente Decl.), ¶¶ 7, 24 and 25.  The Argentine Insolvency Law requires the debtor to obtain the support of two-thirds of the total outstanding amount of the unsecured debt affected by the APE and more than one half in number of the claims affected by the APE.  Id. at ¶ 27.

102.    The debtor may then seek court approval, or *homologation*, of the APE from an Argentine court of competent jurisdiction.  As the Telecom Argentina Court found, the reason for seeking such approval is to bind non-consenting creditors.  Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 3-4.  Again, this process is very similar to the pre-packaged plan process under the U.S. Bankruptcy Code.

103.    To initiate the court process, the debtor must file, in addition to the APE, a number of other documents disclosing its financial condition and its creditors.[4]  Telecom Ex. 2 (Lorente Decl.), ¶ 32.  A court will only confirm an

---

[4] These documents include the following, each certified by a public accountant (preferably the debtor's independent auditors): (i) a statement of assets and liabilities valued as of a cut-off date (the "Assets and Liabilities Statement") on or about the date of the APE; (ii) a schedule listing all of the debtor's creditors, certified as to completeness; (iii) a schedule listing pending lawsuits and administrative procedures against the debtor, indicating the courts where such proceedings are pending; (iv) a schedule listing its accounting books, and other books; and (v) evidence that the Requisite Holders have consented to the APE, indicating the amount of debt affected by the APE that is held by creditors that have expressed their support for and consent to the APE and the number of claims represented by such creditors.  Telecom Ex. 2 (Lorente Decl.) ¶ 32.
(…continued)

APE if full, complete and transparent information has been included in the APE filing. Id. at ¶ 33. Argentine courts presiding over APEs have found that there is an implicit requirement in the APE rules that the court and creditors affected by an APE be provided complete and accurate information. Id. at ¶ 49.

104.    In addition, other laws mandate full disclosure of financial information. For example, Argentine securities laws mandate disclosure of information material to a restructuring pursuant to an APE. Id. at ¶ 33. These disclosure materials are distributed, in accordance with applicable Argentine securities laws, with a view to reaching the owners of a debtor's debt securities to solicit their vote to accept or reject the APE proposal. Id.

105.    There is no dispute that Telecom Argentina provided creditors with a great deal of information regarding its APE,[5] and the Argentine Court so found. Telecom Ex. 1 (Caride Trial Decl.), ¶¶ 22, 26, and 28-30, Telecom Ex. 1, Tab D (Final Solicitation Statement) and Tab H (Argentine Court Order, dated 2/25/05).

## C.    Court Review of the APE Vote

106.    After the initial papers are filed, the Argentine Court makes an initial determination whether an APE has been validly filed, by ensuring that the requisite majority votes were obtained in an appropriate manner.

(continued…)

---

[5] Dr. Rivera had no knowledge of the disclosure of information to creditors in Telecom Argentina's case and, therefore, offered no opinion regarding this issue. Tr. Rivera 73:9-73:22.

107.    In this case, the Argentine Court required Telecom Argentina to submit all the consents and powers of attorneys (letters of transmittal) received from its creditors for review by the Court.  Telecom Ex. 2 (Lorente Decl.), ¶ 64 (discussing resolution dated 11/3/04).  The Court also required Telecom Argentina to submit an auditor's certificate certifying the existence and the outstanding amount of its bank debt.  Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

108.    The Argentine Court ordered Telecom Argentina to hold a noteholders meeting at which creditors would vote on the APE and select a form of consideration.  Id.  The Court examined the procedural fairness of the APE solicitation process, reviewing Telecom Argentina's solicitation materials and other documents to ensure that the required majority approval votes had actually been achieved.   Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05), at 1, and Tab I (Argentine Court Order, dated 5/26/05), at 4-5.

**D.    Protective Aspects of Argentine Insolvency Law**

109.    Telecom Argentina's board and management remained in possession, so two overseers were appointed to perform certain specified tasks.

> Given the particulars of the APE, pursuant to the applicable laws, given the lack of trustees and under the terms of  Section 36 of the Code of  Procedure and Section 45 bis, subsection 8 of the BL to the effects therein, Messrs. Mario Ernesto Kaminker and Jorge Daniel Grispo, both domiciled at Avda Carlos Pellegrini 961, 5th Floor of [the City of Buenos Aires], are hereby appointed judicial overseers, whose duties shall be to: 1) enforce the requirements set forth above; 2) examine any

32

> documents deemed necessary, obtaining copies; 3)
> request explanations; and 4) in order to gain access
> to any place that is necessary and maintain the order
> of the Meeting, they may require the aid of the
> police forces, and shall be required to report to the
> Court the outcome of their mission in the Notarial
> minutes that will supplement the minutes required
> to be taken at the Meeting.

Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

110.    In addition, the directors and officers of Telecom Argentina were required to act as "good business persons" with respect to creditors, both prior to the filing of an APE proceeding as well as during and after any such proceeding, and to adhere to a number of other laws governing the conduct of officers and directors of a public company.  Telecom Ex. 2 (Lorente Decl.), ¶¶ 59-61.

111.    Upon a judicial determination that a debtor has validly filed its APE, a stay comes into effect regarding affected claims.  Id. at ¶¶ 8 and 34. Article 60 of the Argentine insolvency law prohibits the debtor from making any payments on affected claims.  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 60.  Article 72 automatically stays all claims against the debtor and all of its assets arising under the debt instruments affected by the APE, to the same extent that such claims would be stayed in the case of the filing of a *concurso preventivo*, or plenary bankruptcy proceeding.  Id. at Art. 72.

112.    In the Telecom Argentina case, the stay came into effect on October 21, 2004, and was confirmed by the court in a resolution dated February 25, 2005.  Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05).  In that resolution, the Court specifically restrained Telecom Argentina from use of much

of its property, in particular, real estate and registered moveable assets.  Id.
(imposing a "general restraint on the disposition of the debtor's property"); Tr.
Rivera 74:14-74:23 (acknowledging that the Argentine Court barred Telecom
Argentina from disposing of its assets during the confirmation proceedings).

113.    Courts have also undertaken to ensure that the debtor does not
dispose of assets outside the ordinary course of business for the duration of the
APE process.  Telecom Ex. 2 (Lorente Decl.), ¶ 56.  In at least six proceedings,
including Telecom Argentina's APE proceedings, courts have enjoined the
petitioners from transferring or disposing properties and assets by ordering a
precautionary measure to restrain transfer of assets, which is registered in public
records.  Id.; Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05).

114.    The Argentine Insolvency Law also provides procedures for the
avoidance of preferential or fraudulent dispositions of property.  Telecom Ex. 2
(Lorente Decl.), ¶¶ 55, 58.  Depending on when and in what context a preferential
or fraudulent conveyance was made, creditors affected thereby may object to the
confirmation of an APE or request that a confirmed APE be declared null and
void on this ground.  Id. at ¶ 55.

115.    Further, the general principle of equal treatment of similarly
situated classes of creditors affected by a restructuring plan prevents a debtor
from making discriminatory payments to creditors affected by its APE.  Id. at ¶
58.

E.        **Subsequent Proceedings and Creditor Participation**

116.    After a court concludes that the filing requirements are met, public notice is issued to open an objection period.  Tr. Lorente 25:17-25:22; Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 18.

117.    Objections unrelated to confirmation may be raised prior to the period in which the Argentine Court hears confirmation objections, and thereafter objections related to the confirmability of the APE will be heard.  Non-confirmation objections that could be asserted prior to the period for submitting confirmation-related objections include objections based on an entity's eligibility, financial or otherwise, to be a debtor in an APE proceeding, since the Argentine Insolvency law provides that a debtor must "have economic or financial difficulties" in order to qualify.  Telecom Ex. 3 (Lorente Supp. Decl.), ¶¶ 20-21.

118.    Therefore, a creditor, such as Argo, could have objected to Telecom Argentina's APE on the ground that Telecom Argentina was not financially eligible to be a debtor as required by the APE law.  Id. at 21.

119.    Once the initial filing has been approved, objections to confirmation may be made.  Argentine courts may hear objections to confirmation of an APE based on many grounds, derived from both the Argentine Insolvency Law and from other general bodies of law.

120.    Under Article 75 of the Argentine Insolvency Law, a creditor may object based upon either (a) misrepresentation in the Assets and Liabilities Statement filed with the Argentine court, or (b) failure of the debtor to obtain the

support and consent of the Requisite Holders.  Telecom Ex. 2, Tab A (Argentine

Insolvency Law), Art. 75.

121.    Article 75 also permits objections regarding whether the legal

requirements of an APE have been met.  Id.; Tr. Lorente 40:8-40:14.  This broad

right stems from the second paragraph of Article 75, which states: "When legal

requirements have been met and no objections are raised, the Court shall approve

the APE."  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 75.  This

language broadens the scope of permissible objections to an APE.  Tr. Lorente

41:10-41:14.  Dr. Rivera agreed that the second paragraph of Article 75 directs

judges to consider these requirements before approving an APE.  Tr. Rivera

60:20-60:24.

122.    In addition, the 2002 Amendments brought into existence Article

52.4, which enables creditors to object to the confirmation of an APE on grounds

that the APE is "abusive or fraudulent."  Telecom Ex. 3 (Lorente Supp. Decl.),

¶ 24.  Article 52.4 provides that "[i]n no case shall the Court approve a proposal

that is abusive or contrary to law."  Telecom Ex. 2, Tab A (Argentine Insolvency

Law), Art. 52.4.  In addition to inviting creditor objections, Article 52.4 imposes

an obligation on the Argentine court to review the APE for abusiveness.  Tr.

Lorente 34:2-34:6.

123.    The concept of "abusiveness" is defined broadly.  Telecom Ex. 3

(Lorente Supp. Decl.), ¶¶ 29-30; Tr. Rivera 76-77.  "Abusiveness" is a fact-

specific inquiry that must be determined on a case-by-case basis.  Tr. Lorente

48:2-48:7.  Creditors may question the abusive features of an APE on any ground.

"That is not limited."  Tr. Rivera 76-77, 74:24-75:8 (stating that "creditors have

the right to call attention to the judge about the abuse [or] fraud, and of course

they make all kinds of argument").

124.    There are many Argentine cases in which Argentine courts have

considered the issue of abuse and fraud.  Telecom Ex. 3 (Lorente Supp. Decl.),

¶ 26; Tr. Lorente 38:6-38:8.  As one such case noted:

> The powers of the judge, also confirmed by case
> law upon rejecting in numerous cases the approval
> of abusive agreements . . . are fully applicable to the
> [APE].
>
> Additionally, and as is already known, the [2002
> Amendment] expressly addressed such powers by
> setting forth in section 52, sub-section 4 of Law No.
> 24,522 that *"The Judge shall in no case approve a
> proposal which is abusive or contrary to the law."*
> (Julio César Rivera, Institutes of Bankruptcy Law,
> Volume 1, page 478 . . . .).

Telecom Ex. 3, Tab H (Micro Omnibus Norte S.A., Order, dated 9/14/05), at 5-6

(emphasis in original).

125.    Although Dr. Rivera initially claimed that the Argentine legal

definition of the term "abusive" is limited, and that Art. 75 provides the only

grounds on which creditors can object to an APE, he agreed at trial that there was

no limit to the possible objections:

> Q       Is it true that you testified on Saturday that
> in response to the question whether a creditor could
> object under Article 52(2)(b)(4), the creditor can
> state that the APE is abusive or fraudulent.  What is
> abusive or fraudulent and especially what is abusive
> are standards that have to be applied in every

37

> specific case. And you [] went on to say, the
> creditor could question the abusive features of an
> APE with all kinds of reasons. That is not limited.
> And then you go on to say, there is nothing against
> the concept that within the argument the idea would
> include that the results of the liquidation will be
> better. Is that accurate?
>
> A        Yes, it is.

Tr. Rivera 76-77. [6]

126.    Dr. Rivera attempted to argue that the bases upon which creditors

could object were procedurally limited, contending that creditors can object under

Article 75 but may only file a *denuncia* under Article 52.4, and that a judge is not

required to consider a *denuncia*. Tr. Rivera 65:19-66:5. However, Dr. Rivera

agreed that the concept of a *denuncia* comes from only one Argentine case. Tr.

Rivera 82:23-83:6. In any event, there is no substantive or material difference

between a *denuncia* and an objection. As Dr. Rivera recognized, "like Dr.

Lorente said in his declaration, the creditors have the right to call attention to the

judge about the abuse [or] fraud, and of course they make all kinds of argument."

Tr. Rivera 74:24-75:8. Dr. Rivera also testified that he is unaware of any lower

court or appellate authority that prevents a creditor who files a *denuncia* from

raising an appeal. Tr. Rivera 81.

---

[6] Dr. Rivera's limited definition also ignored the fact that the term "abusive" is a legal term defined in Article 1071 of the Argentine Civil Code, which the appellate courts have held is applicable to APE proceedings. Telecom Ex. 3 (Lorente Decl.), ¶ 30. As set forth in Article 1071 of the Argentine Civil Code, "[t]he abusive exercise of rights shall be considered that which contravenes the purposes the law had in mind when recognizing them or that which exceeds the limits imposed by good faith, ethics, and morals." Id. (citing Article 1071 of the Argentine Civil Code).

127.     In the Telecom Argentina case, the Court required extensive notice of various steps in the confirmation process, including the bondholder meeting held on February 4, 2005, and the process by which it was determined that the APE proceeding had been properly filed.  Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05) and Tab I (Argentine Court Order, dated 5/26/05); Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

128.     Consequently, creditors had ample opportunity to object to the Telecom Argentina APE on all of the grounds now raised by Argo in this Court. As Telecom Argentina's expert, Dr. Lorente, testified without contradiction

> [I]t is my opinion that the Argentine Insolvency Law and Telecom Argentina's APE proceedings provided creditors, including Argo, with a full and fair opportunity to assert objections to the APE, and that these objections were considered in a meaningful way by the Argentine Court.

Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 8.[7]

129.     Further, Argentine courts are empowered to require evidence where appropriate in considering objections.  An Argentine court may rule on issues of law without requiring evidence, or may order that evidence be produced if an issue of fact exists.  Id. ¶ 32; Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 75.  Therefore, a creditor may put forth, or demand, evidence with regard to any objection to an APE.

---

[7] Dr. Rivera, Argo's expert, had not studied Telecom Argentina's Argentine Court proceedings prior to issuing his opinion and neither did contradict, nor could have contradicted, Dr. Lorente's testimony.  Tr. Rivera 73:23-74:13.

130.    In fact, four creditors filed objections to the Telecom Argentina
APE.  Two are relevant here.

131.    One creditor claimed that the plan was abusive because it did not
grant non-consenting creditors the same consideration options as those granted
consenting creditors.  "The proposal is abusive or violates the *credito pars
creditorum* . . . [The APE] implies a differential and abusive treatment under the
bankruptcy system on the basis of the aforementioned principle and the remaining
legal provisions they quote."  Telecom Ex. 1, Tab I (Argentine Court Order, dated
5/26/05), at 3.

132.    Telecom Argentina opposed on the grounds, *inter alia*, that the
objection was outside the scope of Article 75.  Id.  The Argentine Court overruled
the objection and granted the relief, requiring that the APE provide the same
consideration options to consenting and non-consenting creditors alike.  Id. at 4-5.
This ruling is one example of the fact that the bases for objection go beyond the
scope of Article 75, and further demonstrates the commitment of the law
generally, and of the Argentine Court in particular, to equal treatment of similarly
situated creditors.

133.    Another creditor objected on the ground that the plan was abusive
because Telecom Argentina could have paid more because creditors would have
received more in a liquidation. Tr. Lorente 27:6-27:10.  This claim was deemed
untimely, but Dr. Lorente testified that the creditor had stated a valid legal ground
of objection:

40

> [I]f you can pay more because you have more assets
> and you are offering less and you reach a plan that
> offers less, that objection could be raised because
> you are being abusive with that plan.

Tr. Lorente 32:8-32:13.

134.    Dr. Rivera agreed that the issue whether a debtor could pay more

could be raised in an objection.  Tr. Rivera 74:24-75:21.

135.    It was also agreed that in considering this objection, the Argentine

Courts have requested evidence regarding liquidation value.  Tr. Rivera 76:2-

76:11.  Dr. Lorente testified that the "abusiveness concept includes liquidation

value."  Tr. Lorente 34:8-34:11.

136.    Thus, the evidence demonstrates that Argo could have objected to

Telecom Argentina's eligibility to file its APE, as a pre-confirmation objection,

and to the fairness or abusiveness of the substantive provisions of the APE, in

connection with confirmation.  Argo made no objection at any stage in the

Argentine courts.  Notwithstanding Argo's silence before the Argentine courts,

Argo now seeks to attack the Argentine Court's findings collaterally in this

forum.

137.    Further, no evidence was offered to suggest that U.S. creditors

suffered any prejudice or inconvenience in their ability to participate in the

Argentine proceedings, or in the processing of their claims.[8]  Indeed, all creditors,

---

[8] Argo is not a U.S. creditor.  (Respondent The Argo Fund, Ltd.'s Answer, Defenses and
Objections to the Verified Petition of Telecom Argentina, S.A. (Docket no. 10), at 10).  There is
no need to address the question whether Argo is entitled to the protections of Section 304.

41

wherever situated, were required simply to send a letter of transmittal indicating
their vote on the APE, and all were invited to the bondholder meeting and to
participate in the process generally.  Telecom Ex. 1, Tab D (Final Solicitation
Statement), at cover page 2, and Tab F (Argentine Court Order, dated 12/6/04).
No evidence was presented to demonstrate that any U.S. creditor was dissatisfied
with the APE.

**F.      Grounds for Approval of An APE**

138.    As a matter of Argentine law, the Argentine Court would not have
confirmed the APE if the Court had found that the APE exceeded the limits
imposed by good faith, ethics, and morals.  Telecom Ex. 3 (Lorente Supp. Decl.),
¶ 31.

139.    As noted, the Telecom Argentina Court was presented with and
considered four objections to the APE.  The Argentine Court addressed each
objection in the Approval Order, finding, *inter alia*, that Telecom Argentina had
met the financial eligibility requirements ("taking into consideration the
restructuring sought as a means of turning around the business crisis") and had
met the requisite standards for approval.  Telecom Ex. 1, Tab I (Argentine Court
Order, dated 5/26/05).

140.    Thus, the Court found:

> In respect of the proposal made, taking into
> consideration the restructuring sought as a means of
> turning around the business crisis, the elements
> provided to the case by the debtor and those required
> by the Court, such proposal does not appear to be

> abusive, fraudulent or discriminatory in accordance
> with the applicable legal regulations.

Id.

141.    As noted, the Court ruled that all creditors were to be given the

same consideration options.[9] Id. at 4-5.

142.    Therefore, under the approved APE all affected creditors were

treated equally and justly, consistent with the required provisions for distribution

in a case under the U.S. Bankruptcy Code.

143.    The Argentine Insolvency Law does not require that a restructuring

plan, particularly an agreed APE, eliminate the rights of equity holders.  Telecom

Ex. 2 (Lorente Decl.), ¶ 24 n.1.  Here, Telecom Argentina had advised its

creditors that any change in the direct or indirect ownership of Telecom Argentina

would result in the termination of its license and its business.  Telecom Ex. 1, Tab

D (Final Solicitation Statement); Tr. Lorente 30:12-30:19, 30:22-30:23, 89:16-

90:3.  Consequently, no such requirement was demanded by creditors in the

Telecom Argentina APE, and no objection was made on the basis that ownership

would be unchanged under the APE.  Telecom Ex. 1, Tab I (Argentine Court

Order, dated 5/26/05).

---

[9]    Although Argo's expert initially believed that Telecom Argentina's proposal treated
creditors unequally because dissenting creditors were not given the same opportunity as
consenting creditors to choose among the three consideration options, he had failed to review the
Argentine Court's order mandating a change in the APE.  Tr. Rivera 71:17-73:8.  After
discovering that the Approval Order required Telecom Argentina to allow dissenting creditors to
elect from the three options, he agreed that the basis for his objection no longer existed.  Id.

**G.**     **Telecom Argentina APE Recoveries Were Very High**

144.     Mr. Caride, Telecom Argentina's Finance Director, testified
without contradiction that creditor recoveries ranged from 80.3% to 100% of
outstanding principal face amount of their claims, plus an additional amount for
interest.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 33.

145.     Dr. Lorente, Telecom Argentina's expert, testified without
contradiction that the consideration provided by Telecom Argentina in its APE
was the "best consideration I have seen in an APE."  Tr. Lorente 31:18-31:20.

146.     Mr. Caride also testified, without contradiction, that 94.4% of
principal face amount of debt, or approximately 82.4% in number, of affected
creditors voted for the APE.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 34.  These
numbers well exceed the voting requirements of Argentine law, and well exceed
the voting requirements of U.S. law for approval of a plan.

147.     Between the August 31, 2005 Closing date and December 5, 2005,
additional non-consenting creditors agreed to the terms of the APE and collected
payments totaling approximately US$34,230,000.  Telecom Ex. 1, Tab L (Chart
of Positions of Non-Participating Creditors).

**H.**     **Post Confirmation Grounds for Objection or Appeal**

148.     The court reviewing the APE must rule on any objections within
the ten days following the close of evidence.  Telecom Ex. 2 (Lorente Decl.),
¶ 44.  A party whose objection is overruled by the court reviewing the APE may
appeal such decision within five business days.  Id.  No evidence was offered to

suggest that the right to appeal the overruling of an objection was in any way limited.  Tr. Rivera 81:23-81:25, 82:1-82:6.

149.    In its Approval Order, the Argentine Court required that notice of the Approval Order be widely circulated, and it was.  Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

150.    No appeal was brought from the Approval Order.

151.    Even if Argo had discovered grounds for attacking the APE after the order had become final, Argo could have at that point attacked the APE. Creditors may bring claims under Argentina's Civil Code to challenge the validity of an APE fraudulently obtained or otherwise in violation of Argentine public order.  Telecom Ex. 2 (Lorente Decl.), ¶ 46.  Further, under Article 60, an affected creditor may file a petition to have an APE that has been confirmed declared null and void based on willful misrepresentation in the Assets and Liabilities Statement, or the creation of illegitimate preferences in favor of certain creditors, which, in either case, is discovered after the court confirmation of the APE. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 60.

152.    No such attack was brought in the Argentine courts, by Argo or any other creditor.

## I.    The *Res Judicata* Effect of the Argentine Court's Decision

153.    Pursuant to the Argentine Insolvency Law, an APE that has obtained final court confirmation is entitled to *res judicata*.  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Arts. 55 and 56.  Consequently, the Approval

45

Order is entitled to *res judicata* and binds all affected creditors, both consenting

and non-consenting.  Id.

154.    Therefore, an Argentine court would not enforce an order of this or

any other court that was inconsistent with the Approval Order.  Telecom Ex. 2

(Lorente Decl.), ¶ 81.

155.    Pursuant to the approved APE, on August 31, 2005, Telecom

Argentina paid, or made available to the consenting creditors, the consideration

contemplated in the APE.  The consideration owed to non-consenting holders of

Old Notes was transferred into a trust, and is available for distribution to any such

creditor that acknowledges the extinguishment of its claims and agrees to the

cancellation of their old debt.  Telecom Ex. 1 (Caride Trial Decl.), ¶ 46.

156.    Pursuant to Article 55, the confirmation of Telecom Argentina's

APE coupled with the closing of the APE caused the novation of all claims

affected by the APE.  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 55.

The Old Notes are cancelled and replaced by the new obligations issued under the

APE.  "The old [bonds] ha[ve] been [extinguished] because of that order, that

final order, and the new debt, the new [bonds] ha[ve] been bor[n]."  Tr. Lorente

29:2-29:5.  Consequently, the old debt is extinguished.  Telecom Ex. 2 (Lorente

Decl.), ¶ 68.

157.    U.S. Bank, the indenture trustee for the Old Debt, is bound by the

Approval Order as a matter of Argentine law and is therefore required to cancel

all of the Old Notes, including those few held by non-consenting holders of Old

Notes.  Telecom Ex. 2, Tab A (Argentine Insolvency Law), Arts. 55 and 56;

Telecom Ex. 2 (Lorente Decl.), ¶¶ 68 and 69.

**J.      The Consequences of Breach of the APE**

158.    If Telecom Argentina now chose, or were required, to treat Argo or

any other non-consenting creditor differently from all of those who have taken the

consideration offered in the APE, Telecom Argentina would risk liquidation.

Telecom Ex. 2 (Lorente Decl.), ¶ 79.

159.    Articles 60-63 establish the effects of a failure by Telecom

Argentina to fulfill its obligations under the APE.  If a court were to compel

Telecom Argentina to comply with an order inconsistent with the Approval Order,

Telecom Argentina would be forced to breach its APE.  Any such payment would

be considered null and void, and Telecom Argentina would run the risk that the

company could be placed in immediate liquidation.  Id.; Telecom Ex. 2, Tab A

(Argentine Insolvency Law), Arts. 60-63; Tr. Lorente 29:17-30:2.

## CONCLUSIONS OF LAW

160.    Telecom Argentina filed its Section 304 petition to seek an order

of this Court granting recognition to the Approval Order and the APE.

161.    Section 304 provides that a bankruptcy court may hear a "case

ancillary to a foreign proceeding" brought by a "foreign representative" of the

debtor in a district where venue is proper. 11 U.S.C. § 304(a); 28 U.S.C.

§ 1410(c).

162.    There is no dispute that the Board is a "foreign representative" of Telecom Argentina and that venue in this district is proper.

163.    Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as: "[A] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization[.] 11 U.S.C. § 101(23)."[T]he phrase 'foreign proceeding' is to be broadly construed." In re Netia Holdings S.A., 277 B.R. 571, 581 (Bankr. S.D.N.Y. 2002) (citing In re MMG LLC, 256 B.R. 544, 550 (Bankr. S.D.N.Y. 2000)) (footnote omitted).

164.    To constitute a "foreign proceeding" under Section 101(23) of the Bankruptcy Code, three requirements must be met:

> (1) the proceeding must entail an administrative or judicial process involving insolvency or reorganization;
>
> (2) it must be conducted for the purpose of liquidating an estate, adjusting its debts or effecting its reorganization; and
>
> (3) it must be pending in a foreign country where the debtor maintains its residence, domicile, [or] principal place of business.

Id. at 581 (quoting MMG, 256 B.R. at 550) (alteration in original).

165.    Courts also consider "the amount of judicial involvement and supervision or, conversely, the degree of access to the court available at various

stages to creditors so that they may voice any objections they may have." In re
Bd. of Dirs. of Hopewell Int'l Ins. Ltd., 238 B.R. 25, 50 (Bankr. S.D.N.Y. 1999)
(citations omitted), aff'd, 275 B.R. 699 (S.D.N.Y. 2002); see also In re Ward, 201
B.R. 357, 361 (Bankr. S.D.N.Y. 1996); In re Tam, 170 B.R. 838, 843 (Bankr.
S.D.N.Y. 1994).

166.   At the trial in this case, the experts agreed that an APE proceeding
is a judicially supervised insolvency proceeding, and that Telecom Argentina's
APE proceeding was subject to judicial supervision.

167.   Under section 304 of the Bankruptcy Code, the rule of the foreign
jurisdiction "need not be identical to those of the United States" but it must be
"substantially in accordance" with United States bankruptcy law. In re Board of
Dirs. Telecom Argentina, 05 Civ. 8803 (SAS), 2005 U.S. Dist. LEXIS 28640,
*11, citing Bank of New York v. Treco (In re Treco), 240 F.3d 148, 158 (2d Cir.
2001; In re Petition of Hourani, 180 B.R. 58, 65 (Bkrtcy.S.D.N.Y.,1995) ("There
is no requirement in section 304 that other nations adopt or mirror our Bankruptcy
Code... The key is that the insolvency laws in the foreign proceeding must not be
repugnant to this nation's general principles of justice, regardless of the form in
which those principles are manifested.")

168.   The rules governing an APE are consistent with the Bankruptcy
Code. Both require approval of the holders of two-thirds of the unsecured
indebtedness and more than half of the number of claims affected by the
proceedings. See Multicanal, 314 B.R. at 505; Telecom Ex. 2 (Lorente Decl.),

¶¶ 25-30.  Both provide for a stay of litigation against the debtor.  See Multicanal, 314 B.R. at 505; Telecom Ex. 2 (Lorente Decl.), ¶¶ 8 and 34.  In both, the debtor remains in possession of its property, while the bankruptcy court exercises supervision over the APE process.  See Multicanal, 314 B.R. at 505; Telecom Ex. 2 (Lorente Decl.), ¶¶ 7, 9 and  35.  In both, the court ensures that the required majorities have been obtained.  See Multicanal, 314 B.R. at 505-06; Telecom Ex. 2 (Lorente Decl.), ¶¶ 25-30, 32 and 38.  Argentine courts, like their U.S. counterparts, retain the power to unwind the proceeding if the confirmation of the plan has been obtained by fraud.  Telecom Ex. 2 (Lorente Decl.), ¶¶ 45-46 and 71.

169.    This Court has already found that an APE proceeding is a "foreign proceeding."  See Multicanal, 314 B.R. at 501 (holding that an APE proceeding was "clearly a judicial 'proceeding . . . for the purpose of . . . adjusting debts . . . or effecting a reorganization[,]'" and that Argentine APE proceedings are sufficiently similar to prepackaged Chapter 11 cases so as to lead to their classification as a "foreign proceeding" under Section 304).

170.    In the Multicanal case, Judge Gropper analyzed in detail the provisions of Argentina's APE law, and found it worthy of recognition under Section 304 based upon well settled precedent.  See, e.g., Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 537 (1883); Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard), 773 F.2d 452, 458 (2d Cir. 1985); In re Treco, 240 F.3d at 153-54; Koreag, Controle et Revision S.A. v. Refco FX Assocs. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341, 358 (2d Cir. 1992).

171.    The Court concluded that the APE law generally, and Multicanal's APE in particular, were entitled to recognition.[10]  Id. at 523.  Specifically, the Court concluded that "Multicanal's APE, which bears many similarities to a prepackaged Chapter 11 proceeding, is the type of reorganization proceeding that, in principle, is subject to recognition under § 304."  Id. at 509.

172.    Likewise, the evidence and record before me demonstrate that an APE proceeding under the Argentine Insolvency Law is entitled to comity.

173.    In addition, the Telecom Argentina APE, and the Approval Order, qualify for recognition under Section 304.

174.    Section 304(c) of the Bankruptcy Code provides:

> In determining whether to grant relief under [Section 304(b)] the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with –
>
> (1)    just treatment of all holders of claims against or interests in such estate;
>
> (2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3)    prevention of preferential or fraudulent dispositions of property of such estate;
>
> (4)    distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

---

[10] The Multicanal APE was found to have certain deficiencies that are not relevant here.

51

(5)    comity.

11 U.S.C. § 304(c).[11]

**1.    Just Treatment Of Affected Creditors Was Provided**

175.    Section 304 requires the just treatment of all holders of claims

against or interests in the estate of the foreign debtor. 11 U.S.C. § 304(c)(l).

"[T]he requirement of just treatment implicates general due process standards

[and] § 304(c)(1) [is] satisfied if a foreign proceeding provides for a

comprehensive procedure for the orderly and equitable distribution of [a debtor's]

assets among all of its creditors." Multicanal, 314 B.R. at 510 (quoting In re

Treco, 240 F.3d at 158 (internal quotations omitted and final alteration in

original).

176.    There is no dispute that Telecom Argentina's APE proceeding

provided holders of all affected claims with notice, due process and an

opportunity to participate in negotiating the APE, in voting to approve the APE,

and in the court-supervised approval process.  Telecom Ex. 1 (Caride Decl.),

¶¶ 10-21, 24-32, 38-39 and 43.

177.    I find that this element of Section 304 has been met.

---

[11]  The sixth enumerated factor, the "provision of an opportunity for a fresh start for the
individual that such foreign proceeding concerns," does not apply to this case because Telecom
Argentina is a business entity.  See In re Culmer, 25 B.R. 621, 631 n.4 (Bankr. S.D.N.Y. 1982)
(The § 304(c)(6) factor "by its terms relates to individual debtors and thus has no application" in
the case of a business entity.).

2.    **United States Creditors Were
      Not Prejudiced Or Inconvenienced**

178.    The next Section 304 factor considers the "protection of claim

holders in the United States against prejudice and inconvenience" in the

processing of their claims in the foreign proceeding.  11 U.S.C. § 304(c)(2).

179.    No evidence was presented to suggest that U.S. creditors did not

participate in the APE on exactly the same terms as all other affected creditors, or

were otherwise prejudiced or inconvenienced.  On the contrary, Argo seeks to

force better terms than other creditors  – and in any event, it is not clear that the

Cayman Island-based Argo is a U.S. claimholder entitled to protection. 11 U.S.C.

§ 304(c)(2).

180.    Thus, to ensure that U.S. creditors were given appropriate

information, Telecom Argentina filed a registration statement describing the APE

with the SEC which allowed Unites States creditors to be informed and to

participate in the process.  Telecom Ex. 1 (Caride Decl.), ¶ 28 and Tab D (Final

Solicitation Statement).  As in Multicanal, notice of the APE was "extensive and

highly sophisticated," id., including the Registration Statement, newspaper

notices, materials on a website, and the solicitation statement.  Telecom Ex. 1

(Caride Decl.), ¶¶ 10 and 24-32.

181.    Nor were U.S. creditors prejudiced by the processing of claims.

U.S. noteholders were required to return a letter of transmittal to The Bank of

New York, the settlement agent, to participate in the APE.  Telecom Ex. 1, Tab D

(Solicitation Statement), at cover page 2.

182.    I find that this element of Section 304 has been met.

**3.    Argentine Law Provides Procedures For
The Prevention Of Preferential Or
Fraudulent Distributions Of Estate Property**

183.    The third Section 304 factor examines the protections against

preferential or fraudulent dispositions of property in the foreign proceeding.  11

U.S.C. § 304(c)(3).

184.    No issue has been raised regarding preferential or fraudulent

distribution. In any event, a creditor could have objected to the APE's

confirmation if a preference or fraudulent conveyance had not been disclosed by

Telecom Argentina.  Telecom Ex. 2 (Lorente Decl.), ¶¶ 51 and 55-58.

185.    Further, a stay prevented payments to affected creditors, and the

Argentine Court imposed restrictions upon any transfer of property by Telecom

Argentina during the case.  Telecom Ex. 1, Tab H (Argentine Court Order, dated

2/25/05).  These safeguards are exactly the same as the safeguards in the

Multicanal APE proceeding, which was found to have satisfied Section 304(c)(3).

Multicanal, 314 B.R. at 508-09.

186.    I find that this element of Section 304 has been met.

4.      **The APE Provides For Distribution Substantially**
        **In Accordance With The Bankruptcy Code**

187.    The fourth factor considers whether the distribution of the property

of the estate pursuant to the foreign proceeding is "substantially in accordance"

with the United States Bankruptcy Code.  11 U.S.C. § 304(c)(4).

188.    Argentine insolvency law requires that general unsecured creditors

receive like treatment and prohibits discriminatory treatment of similarly situated

creditors, which is virtually identical to U.S. law.  Telecom Ex. 2 (Lorente Decl.),

¶¶ 23, 58, 83 and 85.

189.    Only unsecured holders of financial debt were affected by the

APE, and by virtue of the Approval Order each creditor was given the same

consideration options.  Therefore, distribution was "substantially in accordance

with the order prescribed by the Bankruptcy Code."  Multicanal, 314 B.R. at 506.

190.    Dr. Rivera admitted that all creditors were treated equally by the

Approval Order.  Tr. Rivera 71:17-73:8.

191.    I find that this element of Section 304 has been met.

5.      **The APE And The Approval Order Are Entitled To Comity**

192.    Comity, the fifth and perhaps most important element of Section

304, strongly favors Telecom Argentina's request for declaratory relief,

particularly in a case in which a foreign court with undisputed jurisdiction has

issued a final order, akin to a confirmation order, approving a consensual foreign

proceeding upon the near unanimous approval of its creditors.

193.    The doctrine of comity has been defined by the Supreme Court as:

> [T]he recognition which one nation allows within
> its territory to the legislative, executive or judicial
> acts of another nation, having due regard both to
> international duty and convenience, and to the rights
> of its own citizens or of other persons who are
> under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 164 (1895).

194.    "Outside the § 304 context, U.S. courts have granted comity to foreign insolvency proceedings when it has been demonstrated that 'the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated.'"  Multicanal, 314 B.R. at 502-03 (quoting Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard), 773 F.2d 452, 457 (2d Cir. 1985)); see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.") (citations omitted).  Comity does not require "that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to American laws and policies."  In re Brierley, 145 B.R 151, 166 (Bankr. S.D.N.Y. 1992); In re Culmer, 25 B.R. at 631.

195.    Comity is essential in cross-border bankruptcy cases.  "American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."  Victrix S.S., 825 F.2d at 713 (citations omitted). See also In re Treco , 240 F.3d at 156 ("comity is the ultimate consideration in determining whether to provide relief under § 304.")

196.    The importance of comity is well noted in the newly enacted

chapter 15 of the Bankruptcy Code that has incorporated concepts of section

304(c)(2) with the major difference that comity is elevated as the prime

consideration for the grant of ancillary relief to a foreign representative.  11

U.S.C. § 1507(b).  See also, In re Treco , 240 F.3d at 157, n.7 (a section 304 case

recognizing the potential primacy of comity in the yet to-be-enacted chapter 15

legislation) citing Stuart A. Krause, et al., Relief Under Section 304 of the

Bankruptcy Code: Clarifying the Principal Role of Comity in Transnational

Insolvencies, 64 Fordham L. Rev. 2591, 2591-92 (1996);  Hon. Burton R. Lifland,

Suggested Modification to Ancillary Proceeding Statutes, 4 Am. Bankr. Inst. L.

Rev. 530, 530 (1996).

197.    In determining whether to grant comity, "[t]he key issue is one of

due process and the public policy of the forum."  Multicanal, 314 B.R. at 503

(citing Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir.

1999)).  Specifically, courts should analyze whether the proceeding is conducted

in good faith, id. at 507 ("[Good faith] is incorporated into § 304 through the

concept of comity. . . .  Notice is, of course, a key element of due process.")

(citations omitted), and satisfies "certain indicia of fairness, including 'whether

creditors of the same class are treated equally in the distribution of assets,'" id. at

519 (quoting Allstate Life Ins. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir.

1993)).

198.    The <u>Multicanal</u> court granted comity, finding that Multicanal's

APE had been pursued in good faith due to its fundamental consistency "with the

provisions of a confirmable Chapter 11 plan." <u>Id.</u> at 507.  Similarly, the

Argentine Court has ruled that Telecom Argentina's APE proceeding was

consistent with Argentine law, which, as has been described, was and is

fundamentally consistent with the procedural and substantive requirements of the

Bankruptcy Code.

199.    The Argentine Court has ruled that the APE was an appropriate

response to the business crisis faced by Telecom Argentina.

> In respect of the proposal made, taking into consideration the restructuring
> sought as a means of turning around the business crisis, the elements
> provided to the case by the debtor and those required by the Court, such
> proposal does not appear to be abusive, fraudulent or discriminatory in
> accordance with the applicable legal regulations.

Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 5.

200.    Comity is therefore especially appropriate where, as here, the

Argentine Court has issued a final judgment that the APE meets the requirements

of Argentine Insolvency Law, and that judgment is final and binding on all

affected creditors as a matter of Argentine law.

201.    "Implicit in the notion of the extension of comity is the acceptance

that, once the demands of procedural due process have been met, the court

granting comity must accept the finality of those foreign acts, and not question or

address issues that could have been but were not raised in that foreign

proceeding." <u>Hopewell</u>, 238 B.R. at 60 (internal citation omitted); <u>see also</u> <u>Sure-</u>

Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991)

(recognizing that confirmed plans are binding on debtors and creditors and that

the doctrine of *res judicata* "bars re-litigation not just of those claims which were

brought in a prior proceeding, but of 'any other admissible matter' which could

have been brought, but wasn't") (citations omitted).

202.    As the Court of Appeals for the Second Circuit has recognized, the

"finality interests of *res judicata* are particularly important in the bankruptcy

context, where numerous contending claims and interests are gathered, jostle, and

are determined and released." In re Am. Preferred Prescription Inc., 255 F.3d 87,

94 (2d Cir. 2001) (quoting Corbett v. MacDonald Moving Servs., Inc., 124 F.3d

82, 91 (2d Cir. 1997)).

203.    Argo's grounds for arguing that comity should be denied include

these:

> ?    Telecom Argentina was not insolvent.
>
> ?    Telecom Argentina could have paid more.
>
> ?    Telecom Argentina's APE agreement was
>      not consistent with the Trust Indenture Act.
>
> ?    The APE process does not permit adequate
>      bases for objection to an APE.

204.    None of these grounds will suffice to deny comity.

205.    First, in its Approval Order the Argentine Court found expressly

that the restructuring was undertaken as "a means of turning around the business

crisis," and that Telecom Argentina's APE "does not appear to be abusive,

fraudulent or discriminatory." Telecom Ex. 1, Tab I (Argentine Court Order,

59

dated 5/26/05), at 5.  That ruling, which constitutes a finding that Telecom

Argentina met the financial eligibility requirements to file an APE, was not

contested by Argo in the Argentine Court, and may not be collaterally attacked by

Argo in this Court.

206.    Moreover, the Bankruptcy Code contains no requirement that a

debtor be insolvent to be eligible to file, so the APE law's standards are consistent

with those of the United States.  See, 2 Collier on Bankruptcy, ¶ 109,03[2] at 109-

16 (Alan N. Resnick & Henry J. Sommer, 15th ed. rev. 2005) (insolvency not

required for chapter 7 eligibility).  See also NMSBPCSLDHB, L.P. v. Integrated

Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108,

112 (3d Cir. 2004) ("[A] debtor need not be insolvent before filing for bankruptcy

protection."), cert. denied, 125 S. Ct. 2542 (2005); Official Comm. of Unsecured

Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 163 (3d Cir.

1999) ("It is well-established that a debtor need not be insolvent before filing for

bankruptcy protection.").

207.    Second, whether a debtor could have paid more is not a basis for

withholding comity.  Multicanal, 314 B.R. at 507-08 ("[T]he bankruptcy code

does not require rejection of a consensual plan that has received the requisite vote

because the debtor could 'pay more.'").  While equity holders were permitted to

retain their interests, uncontradicted evidence demonstrated that the alternative

was liquidation, since Telecom Argentina would have lost its operating license.

Telecom Ex. 1, Tab D (Final Solicitation Statement); Tr. Lorente 30:12-30:19.

60

Given the extremely high vote in favor of the APE, U.S. law would favor

approval whether or not the absolute priority rule were met.

208.    Third, a grant of comity does not depend upon adherence to the

Trust Indenture Act, which would prevent most reorganizations where a debtor

has issued public debt. Argentinian Recovery Co., et al. v. Bd. of Dir. Of

Multicanal S.A., No. 04 Civ. 3619 (AKH) (S.D.N.Y. filed Apr. 5, 2005)

(affirming bankruptcy court decision based upon oral ruling); Argentinian

Recovery Co. v. Bd. of Dirs. Of Multicanal S.A., 331 B.R. 537 (S.D.N.Y. 2005)

(reaffirming bankruptcy court's determination); In re Bd. of Dirs. of Multicanal

S.A., 307 B.R. 384 (Bankr. S.D.N.Y. 2004); see also  In re Board of Dirs.

Telecom Argentina, 2005 U.S. Dist. LEXIS 28640, *8 ("If a foreign insolvency

proceeding is entitled to comity under section 304, there is no principaled basis

for concluding that a noteholder's rights under the [Trust Indenture Act] should

trump that proceeding.")    As the Argentine Court noted:

> This is the main reason why an *Acuerdo Preventivo
> Extrajudicial* is filed with a jurisdictional body for
> purposes of approval, that is, to cause the proposal
> to be enforceable against absent or non-consenting
> creditors upon the existence of a majority, but not
> unanimous, acceptance.
>
> In such respect, the legal provisions are consistent
> with the application of the insolvency principles
> relating to the restructuring and protection of
> financially distressed companies, the preservation of
> job positions, equal treatment to creditors in the
> same condition, among others.

Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 4.

61

209.    Finally, the experts agreed that the term "abuse" was an umbrella for a wide variety of objections.  Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 29-30; Tr. Lorente 32:3-32:14; Tr. Rivera 76-77, 74:24-75:8.  Argo availed itself of none of them.

210.    For these reasons, this Court will grant comity to Telecom Argentina's APE Proceeding.

6.    **Argo And U.S. Bank Are Bound By The Approval Order**

211.    As under U.S. law, all affected creditors are bound by an approved APE, to ensure that no creditor may do an end run around the process.  See Telecom Ex. 2 (Lorente Decl.), ¶¶ 7, 10, 37 and 69.  Indeed, the Argentine Court noted in the Approval Order that one of the major objectives of the 2002 Amendment of the APE law was to ensure that minority non-consenting creditors could be bound.  Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 3.

212.    Similarly, under the Bankruptcy Code any creditor is bound by a confirmation order, whether or not the creditor participated in the bankruptcy case.  See 11 U.S.C. § 1141(a); Maxwell Communication Corp. PLC by Homan v. Societe Generale (In re Maxwell Communication Corp. plc), 93 F.3d 1036, 1044 (2d Cir. 1996) ("An order of confirmation concededly binds the debtor and its creditors whether or not they have accepted the confirmed plan."); cf. Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004) ("A bankruptcy court is able to provide the debtor a fresh start . . . despite the lack of

participation of all of his creditors, because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors.") (citations omitted).

213.    Based upon the foregoing, the petitioner's request for relief under section 304 of the Bankruptcy Code is granted.  An order and judgment in accordance with these findings of fact and conclusions of law shall be entered simultaneously herewith.

Dated:        New York, New York
              February 24, 2006

                                    Burton R. Lifland,
                                    United States Bankruptcy Judge